Kimberly ROTH; Garland Roth; Brad Roth, Plaintiffs–Appellants,

v.

G.D. SEARLE & COMPANY, Defendant–Appellee.

No. 93–1282.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 12, 1993.

Decided June 17, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 11, 1994.*

---

* Chief Judge Arnold and Judges McMillian and Wollman would grant the suggestion for Rehearing En Banc.

Roxanne Barton Conlin, Des Moines, IA, argued, for appellant.

K. Michele Anderson, Denver, CO, argued, for appellee.

Before RICHARD S. ARNOLD, Chief Judge, JOHN R. GIBSON,** Senior Circuit Judge, and BEAM, Circuit Judge.

JOHN R. GIBSON, Senior Circuit Judge.

Kimberly, Garland, and Brad Roth brought suit against G.D. Searle & Company seeking recovery for injuries suffered as a result of Kimberly Roth's use of a Cu–7 intrauterine device (IUD). The district court[1] granted summary judgment in favor of Searle, concluding that the statute of limitations barred the Roths' claims, which they filed in March 1989. The court stated Ms. Roth knew of her injuries and either knew or should have known of her potential claims before March 1987—thereby triggering the two-year limitations period. The Roths argue that there were genuine issues of material fact with respect to the statute of limitation issues, that her injuries were latent, and that fraudulent concealment and equitable estoppel prevent application of the time bar. We affirm.

---

** The HONORABLE JOHN R. GIBSON was Circuit Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted, and took senior status on January 1, 1994, before the opinion was filed.

1. The Honorable Harold D. Vietor, United States District Judge for the Southern District of Iowa.

The parties agree about most of the underlying facts. In early 1982, Kimberly Roth consulted with Dr. J.J. Kuncaitis about various methods of birth control. She decided to have an IUD inserted into her uterus, a procedure which Dr. Kuncaitis performed. Searle designed, manufactured, and marketed the device inserted, a Cu–7. The only potential side effects which Ms. Roth recalls discussing with Dr. Kuncaitis involved the possibility of an abortion or an allergic reaction to the copper in the IUD. She does, however, remember receiving a patient brochure which she "briefly read." Searle offered uncontradicted testimony that the brochures distributed at that time contained language warning against pelvic infection and other possible adverse reactions.[2]

Approximately four months after the insertion, Ms. Roth began suffering severe pain in her lower abdomen. When she reported this pain to Dr. Kuncaitis, he referred her to Dr. Victor T. Wilson. Dr. Wilson told Ms. Roth that she suffered from an infection, and removed her IUD. Ms. Roth stated that neither doctor told her the cause of the infection.

Approximately two months after removal of her first IUD, Ms. Roth requested and received a second Cu–7. Although Dr. Kuncaitis wrote that Ms. Roth "has complete understanding of all the potential risks of the IUD," Ms. Roth recalls no discussion of the risks associated with Cu–7 insertions. She does not dispute Dr. Kuncaitis' testimony that she received a second patient brochure about the device.

In June 1983, fourteen months after receiving her second IUD, Ms. Roth suffered extreme pelvic pain that forced her to go to a hospital emergency room. Dr. R.M. Carney removed the IUD, and Ms. Roth stated he told her she never should have had the second IUD inserted. According to Ms. Roth, she did not ask and was not told why the IUD was removed. Her physical problems continued after the removal. Approximately ten days after the procedure, Dr. Kuncaitis assessed her condition as "resolved salpingitis." Ms. Roth underwent more extensive diagnostic procedures three months later. These tests disclosed chronic pelvic inflammatory disease. Dr. Wilson's records reflect that Ms. Roth "states she has had to be on a considerable amount of antibiotics since July and cannot understand why she keeps having reoccurrences of infections despite the removal of the IUD." Dr. Kuncaitis testified he knew by July 1984 that Ms. Roth's IUD was at least a contributing cause of her acute endometritis and acute salpingitis, and that it is a reasonable assumption that he so told her, as is his practice.

Ms. Roth states that she knew in October 1984 that she suffered from an infection of

---

**2.** The brochure gave various warnings and listed potential adverse reactions, including:

\* vaginal discharge and infection

\* inflammation of the lining of the uterus

\* inflammation of the lining of the urinary bladder

\* PELVIC INFECTION INCLUDING INFLAMMATION OF THE FALLOPIAN TUBES, WHICH MAY DAMAGE OR BLOCK THEM. (THIS COULD DECREASE FUTURE CHANCES OF GETTING PREGNANT OR EVEN PREVENT IT AND REQUIRE MAJOR SURGERY).

(Emphasis in the original).

The patient brochure also stated:

"Warnings.

1. Call your doctor for any of the following reasons: \* \* \*

b. Pelvic pain and cramps, especially after the first two or three cycles following insertion, could mean an infection has developed requiring treatment.

Pelvic infections have been reported following insertion of a Cu–7.... Most infections can be eliminated by antibiotic therapy, but if not, the Cu–7 should be removed.

An increased risk of pelvic infection associated with the use of IUDs has been reported. While unconfirmed, this risk appears to be greatest for young women who have never had a baby and/or who have many sexual partners. Pelvic infection can be severe and result in abscesses of the ovaries and tubes, or in general peritonitis. Pelvic infection may include inflammation of the fallopian tubes, which can become damaged and blocked. This could decrease future chances of getting pregnant or even prevent it and require major surgery. Therefore, you should report any symptoms of pelvic infection to your doctor immediately. These symptoms include: new development of menstrual disorders (prolonged or heavy bleeding), unusual vaginal discharge, abdominal or pelvic pain, painful intercourse, and fever. The decision to use any IUD in a particular case must be made by the woman and her doctor with the consideration of a possible deleterious effect on future fertility.

her uterus and fallopian tubes that could affect her fertility. Faced with Ms. Roth's deteriorating condition, Dr. Kuncaitis subsequently referred her to two gynecologists. She consulted Dr. Stanley W. Greenwald in November 1984. He considered her available options to be simply accepting the pain or undergoing surgery. Ms. Roth does not recall asking Dr. Greenwald about the cause of her physical problems. Two years later, Ms. Roth consulted a second gynecologist, Dr. Barbara Beatty, about the desirability of a hysterectomy. Ms. Roth does not recall discussing the cause of her pelvic inflammatory disease or the possibility of a link between pelvic inflammatory disease and IUD use. If asked, however, Dr. Beatty stated she could have told Ms. Roth that the two episodes of pelvic inflammatory disease were "IUD associated salpingitis." [3]

On March 13, 1987, Ms. Roth underwent a total abdominal hysterectomy (i.e., removal of the uterus) and bilateral salpingo-oophorectomy (i.e., removal of the ovaries and tubes). According to Ms. Roth, she first learned of the possible connection between her condition and her IUDs in 1988 when CNN broadcast a report about a woman with similar symptoms. She denies any awareness of the many earlier widely-circulated articles discussing the possible connection between IUDs and pelvic inflammatory disease. The Roths filed this action on March 3, 1989.

The district court concluded that the factual record supported summary judgment in favor of Searle because Iowa's two-year statute of limitations barred the Roths' claims. *Roth v. G.D. Searle & Co.*, No. 4–89–7073, slip op. at 7, 1992 WL 672905 (Dec. 28, 1992). In reviewing the district court's entry of summary judgment, we apply the same standard as the district court. *Trnka v. Elanco Products Co.*, 709 F.2d 1223, 1225 (8th Cir. 1983). We view all facts in the light most favorable to the non-moving party, and give that party the benefit of all reasonable inferences that can be drawn from the facts. *United States v. Columbia*, 914 F.2d 151, 153 (8th Cir.1990); *Woodsmith Pub. Co. v. Mere-*

*dith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990). The court should grant summary judgment if the record, so considered, reveals no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Kuhnert v. John Morrell & Co. Meat Packing, Inc.*, 5 F.3d 303, 304 (8th Cir.1993). The requirement that a fact dispute be genuine means that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). We review de novo, without deference, the district court's interpretation of state law. *Salve Regina College v. Russell*, 499 U.S. 225, 231–32, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

Under Iowa law, the "statute of limitations begins to run when the injured person discovers or in the exercise of reasonable care should have discovered the allegedly wrongful act." *Franzen v. Deere & Co.*, 377 N.W.2d 660, 662 (Iowa 1985). Actual knowledge of one's injury or claim is not required. *Sparks v. Metalcraft, Inc.*, 408 N.W.2d 347, 351 (Iowa 1987). "The statute begins to run when the person gains knowledge sufficient to put him on inquiry." *Id.* Once the plaintiff gains such knowledge, the "plaintiff is charged with knowledge of facts that would have been disclosed by a reasonably diligent investigation." *Id.* Moreover, "the duty to investigate does not depend on exact knowledge of the nature of the problem that caused the injury." *Franzen*, 377 N.W.2d at 662. Rather, "[i]t is sufficient that the person be aware that a problem existed." *Id.*

The Roths argue that there is a genuine issue of fact as to whether Ms. Roth should have discovered her claims before March 1987, and therefore, the district court erred in entering summary judgment against them. The district court held that the undisputed facts show "that [Ms.] Roth knew facts sufficient to put her on inquiry notice, and reasonable inquiry would have led her to discov-

---

**3.** According to Dr. Beatty, this term reflects only the fact that the infection occurred during IUD use. Dr. Beatty declined to comment on whether a causal connection existed.

er her potential claims against defendant before March 3, 1987." The court recounted several facts in support of its position. First, the court stated that Dr. Kuncaitis gave Ms. Roth a "detailed patient brochure warning of PID," which she "briefly read through." Slip op. at 7. The court also found undisputed evidence that Dr. Kuncaitis warned Ms. Roth of at least some IUD-associated risks and that Dr. Carney informed her that she never should have had a second IUD inserted. *Id.* Moreover, the court emphasized that had the Roths asked Dr. Beatty about the cause of her pelvic inflammatory disease, she would have learned that her condition was "IUD associated." *Id.* Finally, the court acknowledged the "considerable media publicity" during the mid–1980s highlighting Cu–7 litigation and the possible link between IUDs and pelvic inflammatory disease. *Id.*

■ For the first time on appeal the Roth's challenge some of the court's "undisputed" facts. They question whether the brochure Ms. Roth received was the same brochure that Searle presented at her deposition. The Roths also argue that Dr. Kuncaitis' warnings were ineffective insofar as he warned Ms. Roth only about sexually transmitted risks, and not about the non-sexually transmitted infection which she allegedly developed. If a party fails to raise an issue for resolution by the district court, however, that issue may not be raised before this court. *Diercks v. Durham,* 959 F.2d 710, 713–14 (8th Cir.1992); *Clarke v. Bowen,* 843 F.2d 271, 273 (8th Cir.1988). The Roths did not raise these concerns in their opposition to Searle's motion for summary judgment. We reject the Roths' attempts to raise these issues for the first time before this court. "The district courts cannot be expected to consider matters that the parties have not expressly called to their attention, even when such matters arguably are within the scope of the issues that the parties have raised." *Stafford v. Ford Motor Co.,* 790 F.2d 702, 706 (8th Cir.1986). A contrary result "could encourage a party to 'sandbag' at the district court level, only then to play his 'ace in the hole' before the appellate court." *Id.*

The Roths' remaining arguments involve their assertion that the district court erred in concluding that, based on the undisputed facts, Searle should prevail as a matter of law. They offer three reasons why the district court should have found their claims to be timely filed: (1) the Iowa discovery rule extends the time for filing when a plaintiff, such as Ms. Roth, suffers from latent injuries; (2) Searle's fraudulent concealment of the Roths' cause of action tolled the statute of limitations; and (3) Searle should be equitably estopped from raising a statute of limitations defense.

■ We first consider the Roths' contention that their claims were timely filed. The discovery rule protects plaintiffs who were "unaware of the accrual of a claim and could not have been aware of it in the exercise of reasonable diligence." *Chrischilles v. Griswold,* 150 N.W.2d 94, 100–01 (Iowa 1967). Iowa law recognizes the discovery rule for product liability actions brought by consumers of medical products. *Wilber v. Owens–Corning Fiberglass Corp.,* 476 N.W.2d 74, 75 (Iowa 1991). The rule "is applied in [certain] cases to prevent the unfairness which would result from assuming a plaintiff was aware of facts which were 'unknown and inherently unknowable.'" *Id.* (quoting *LeBeau v. Dimig,* 446 N.W.2d 800, 802 (Iowa 1987)). The relevant question is when Ms. Roth knew or should have known of her injuries and their possible connection to her IUD. *Sparks,* 408 N.W.2d at 351. "On that date, [the plaintiff] is charged with knowledge of facts that would have been disclosed by a reasonably diligent investigation." *Id.* (quoting *Franzen,* 377 N.W.2d at 662).

Searle contends that, under Iowa law, the statute of limitations period begins running when earlier, less-serious injuries (i.e., Ms. Roth's early pelvic inflammation) manifest themselves, not when a later more-serious injury (i.e., chronic PID and infertility) develops.[4] We need not decide this difficult issue of state law because Ms. Roth obviously

---

4. Some case law supports Searle's position. *See LeBeau,* 446 N.W.2d at 802; *but see Wilber,* 476 N.W.2d at 75, 78. This issue need not be finally resolved by this court because all of Ms. Roth's injuries developed before 1986—still outside the applicable two-year statute of limitations period.

learned of the *existence* of her injuries no later than November 11, 1986, when she obtained a second opinion from Dr. Beatty about the possibility of a hysterectomy and a bilateral salpingo-oophorectomy. It was because she knew of the relative seriousness of her injuries that Ms. Roth sought Dr. Beatty's opinion.

■ The district court concluded that the undisputed facts established that Ms. Roth "knew facts sufficient to put her on inquiry notice, and reasonable inquiry would have led her to discover her potential claims against [Searle] before March 3, 1987." Slip op. at 7. We conclude that the district court did not err in so ruling.

■ First, the brochures given to Ms. Roth specifically warned of "PELVIC IN-FECTION INCLUDING INFLAMMA-TION." Moreover, the brochures plainly state that the insertion of an IUD "COULD DECREASE FUTURE CHANCES OF GETTING PREGNANT OR EVEN PRE-VENT IT AND REQUIRE MAJOR SUR-GERY." Ms. Roth admits briefly reading at least one brochure. After removing Ms. Roth's second Cu–7 in June 1983, Dr. Carney informed her that she should never have had the second device inserted. Collectively, these statements should have alerted Ms. Roth to the possibility of a causal link between the IUD and her disease well before March 1987.[5] Again, under Iowa law, actual knowledge of a causal relationship is not required to begin the running of the statute of limitations. *Sparks,* 408 N.W.2d at 351–52; *Franzen,* 377 N.W.2d at 662.

■ The Roths next argue that the district court erred in refusing to toll the statute of limitations because of Searle's fraudulent concealment of their cause of action. Iowa courts apply the fraudulent concealment doctrine if a plaintiff shows: (1) an affirmative act by the defendant to conceal the cause of action, and (2) that the plaintiff diligently attempted to discover his or her cause of action. *Kurtz v. Trepp,* 375 N.W.2d 280, 282 (Iowa Ct.App.1985); *Pride v. Peter-*

*son,* 173 N.W.2d 549, 555 (Iowa 1970). After considering the Roths' contention that they made these showings or at least raised material questions of fact, the district court dismissed their fraudulent concealment claim with little comment. Slip op. at 7 n. 3.

The record read in the light most favorable to the Roths, gives some support to the proposition that Searle sought at least to downplay, if not suppress, information linking Cu–7s to pelvic inflammatory disease and fertility. The Roths point to 1979 internal company reports and memoranda. There are, on the other hand, the patient brochures we have referred to above, and the evidence that Dr. Kuncaitis and Dr. Beatty were both aware in 1984 and 1986 that the IUD was associated with pelvic infection such as Ms. Roth's. Even assuming that the conflicting evidence meets the first element of fraudulent concealment, the Roths' claim founders on the second element.

■ To avail themselves of Iowa's fraudulent concealment doctrine, the Roths must also prove that they made diligent attempts to discover their cause of action. The Roths argue that they diligently attempted to try to find the cause of Ms. Roth's problems. Ms. Roth did, in fact, question Dr. Kuncaitis when her physical problems first appeared, but at that time Dr. Kuncaitis did not know the cause. Ms. Roth, however, later failed to pursue the issue despite being given ample opportunity. When Dr. Carney removed her second IUD, he told her that she should never have had another IUD inserted. Ms. Roth failed to explore the basis for this opinion. Nor did she question either of the gynecologists whom she consulted after her injuries became more severe. Had Ms. Roth inquired of the doctors, Dr. Kuncaitis and Dr. Beatty made clear that she would have been told, at the very least, that her condition was IUD-associated. Iowa law requires a reasonably diligent investigation. By failing to pursue her investigation beyond the preliminary questioning of Dr. Kuncaitis, Ms. Roth failed to meet the obligations imposed

5. The question before us is whether Ms. Roth knew facts which placed her on inquiry notice, thereby triggering the statute of limitations. Whether Searle's warnings were inadequate or deficient in some other sense is simply not relevant to this issue.

on her, and her fraudulent concealment claim fails.

■ The Roths' final argument focuses on the perceived harshness and unfairness of the unavailability of the fraudulent concealment doctrine. The district court rejected the Roths' argument that Searle should be equitably estopped from asserting a statute of limitations defense. Slip op. at 6 n. 3. Iowa does recognize equitable estoppel as a defense to the application of a time-bar statute. *Beeck v. Aquaslide 'N' Dive Corp.*, 350 N.W.2d 149, 157 (Iowa 1984). This doctrine prevents a party from taking an unconscionable advantage from his own wrongful conduct by asserting his strict legal rights. *See Meier v. Alfa-Laval, Inc.*, 454 N.W.2d 576, 579–80 (Iowa 1990).

There are four elements of equitable estoppel under Iowa law, revolving around misrepresentation or concealment. *Beeck*, 350 N.W.2d at 158; *Bradshaw v. Wakonda Club*, 476 N.W.2d 743, 748 (Iowa Ct.App.1991). Each must be proven by clear and convincing evidence. *Beeck*, 350 N.W.2d at 157.

■ Of these, the existence of misrepresentation or concealment is the most significant issue in this case. Although the Roths contend that virtually any false representation or concealment of facts relevant to the case satisfies this element, we read the Iowa cases applying this theory to limitations issues to require a far more specific misrepresentation or concealment. *See Meier*, 454 N.W.2d at 580; *Beeck*, 350 N.W.2d at 158 (where defendant allegedly concealed true manufacturer's identity, plaintiff could prevail only by showing that the defendant "falsely represented or concealed its identity as the true manufacturer and that its identity was a material fact"). In *Meier*, the Iowa Supreme Court considered whether certain repairs and assurances that the repairs cured the defect gave rise to equitable estoppel. The court found that "there must be some evidence that such repairs and assertions were not only made to conceal the true condition of the product, but also with the intent to mislead the injured party into the trap of the time bar." 454 N.W.2d at 580. The court found nothing to indicate that the defendant's repairs were merely "an attempt to

lull the plaintiffs into inaction." *Id.* The Roths' attack on Searle's course of conduct goes to the merits of their claim, but they do not show that the claimed acts by Searle were intended to mislead them, or others like them, into "the trap of the time bar." *Meier*, 454 N.W.2d at 580.

Searle contends that the Roths also failed to establish another required element of their equitable estoppel claim—that they lacked knowledge of a possible link between Cu–7 and Ms. Roth's injuries. In light of our holding that any misrepresentations by Searle were not specific enough to trigger Iowa's equitable estoppel doctrine, we need not consider whether the Roths have met this additional element. Considering this record, we conclude that the Roths did not establish the elements of equitable estoppel by clear and convincing evidence, and thus the district court did not err in applying Iowa's time bar.

We have considered the Roths' remaining arguments and find them without merit. Accordingly, we affirm the district court's grant of summary judgment to Searle.

RICHARD S. ARNOLD, Chief Judge, dissenting.

The Court holds that, because Ms. Roth failed to investigate diligently the link between the Cu–7 IUD and her injuries, summary judgment is appropriate. This holding fails to take into account that there is a disputed issue of fact as to whether Ms. Roth should have been on notice that her injuries were potentially caused by the IUD. In the summary-judgment context we must view such disputed issues of fact in the light most favorable to the non-movant, giving her the benefit of all reasonable inferences. I believe the Court departs from this principle, and I respectfully dissent.

I.

The Court holds that Iowa's two-year statute of limitations bars Ms. Roth's claims because she could have discovered her cause of action earlier with the exercise of reasonable care. See *Franzen v. Deere & Co.*, 377 N.W.2d 660, 662 (Iowa 1985). The Court

points to the patient brochure Ms. Roth read, as well as to the clues she received from the various treating doctors, in holding that she was on notice as to the cause of her injuries.

First, the Court declines to consider Ms. Roth's assertion that the only warnings she received related to the risk of sexually transmitted diseases and did not concern the non-sexually-transmitted infection she ultimately developed.[6] In declining to address this argument, the Court relies on the fact that Ms. Roth failed to raise this precise issue before the District Court. This holding reflects an unduly strict procedural approach. It picks out a subsidiary issue and unnecessarily bars its discussion.

Under Local Rule 14(h), S.D.Iowa, the District Court requires that parties attach a statement of material fact to their papers supporting and opposing summary judgment.[7] In her Statement of Material Facts, Ms. Roth stated that she did not remember being given any warnings by Dr. Kuncaitis other than that she might experience an allergic reaction or that there was a risk of a spontaneous abortion; she did not remember being warned about PID. Searle argued in its Statement that Dr. Kuncaitis informed Ms. Roth of the risk of infection, citing the doctor's deposition testimony. In his deposition, Dr. Kuncaitis stated that he was certain that he gave Ms. Roth the "common warnings," meaning that the type of behavior that would increase her risk of developing a sexually-transmitted disease—multiple sexual partners, for example—would also increase her risk of getting Pelvic Inflammatory Disease (PID). When Dr. Kuncaitis was expressly asked whether he warned Ms. Roth of the risk of PID, he replied, "Yes. As far as I knew.[8] Not—at that point the way I advised her she did not have an increased risk of developing gonorrhea, but if she did

get it, it would markedly increase the rate of spread from the cervix to the upper gynecologic structures." (Kuncaitis Dep. p. 199, App. 91). Although Dr. Kuncaitis stated that he warned Ms. Roth of the risk of contracting PID, he also emphasized the risk of sexually-transmitted diseases, and later stated that had he known the full side-effects of the Cu–7, he would not have inserted it in the first place. *Id.* at 141.

By arguing that she did not recall being informed of the risk of PID, Ms. Roth placed at issue the caliber of warnings she received. On appeal, she merely asserts a different interpretation of the very deposition testimony upon which Searle relies. The mere fact that Ms. Roth chose not to emphasize her interpretation of this testimony in the District Court does not mean that she is barred from doing so now. See, *e.g., Elder v. Holloway,* —— U.S. ——, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). *Elder* was a § 1983 case where the issue was whether the right was clearly established; neither party cited *United States v. Al–Azzawy,* 784 F.2d 890 (9th Cir.1985), *cert. denied,* 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986), which was in point. The Court of Appeals affirmed on the basis that the parties did not raise the case below and had thereby failed to establish it as a legal fact. *Id.* —— U.S. at ——, 114 S.Ct. at 1022. The Supreme Court reversed the Court of Appeals on the grounds that whether the right was clearly established was a question of law reviewed *de novo* on appeal. *Id.* at ——, 114 S.Ct. 1023. Similarly, whether there is a material issue of fact with respect to what warnings Dr. Kuncaitis gave Ms. Roth is a question of law to be resolved *de novo* by this Court. The District Court had Dr. Kuncaitis's deposition before it, and the question of precisely what he said is included within the question of

---

**6.** The Court refers to the non-sexually-transmitted infection Ms. Roth developed as "alleged[ ]." *Ante,* at 1307. That Ms. Roth had a non-sexually transmitted infection is not contested.

**7.** Rule 14(h) reads as follows:

Upon filing any motion for summary judgment ..., there shall be filed with the motion a separate, short, and concise statement of the material facts as to which the moving party

contends there is no genuine issue to be tried....

The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried....

**8.** This comment is particularly significant given that Dr. Kuncaitis did not completely understand the side-effects of the Cu–7, as discussed later.

what warnings Ms. Roth received, an issue squarely presented to the District Court. Therefore, "sandbagging" at the appellate level is not a legitimate concern in this case.

Moreover, in *Stafford v. Ford Motor Company*, 790 F.2d 702, 706 (8th Cir.1986), a decision relied upon by the Court, the plaintiff argued for the first time on appeal that he had exhausted his internal union appeals procedures under section 2(b) of the UAW Constitution. After stating our general requirement that all issues must be brought first before the District Court, we noted that it is within the authority of this Court to rule on an issue not passed on below when "injustice might otherwise result" and proceeded to reverse and remand for consideration of the plaintiff's new argument. In the present case, declining to address a subsidiary issue that was squarely presented by the proffered deposition testimony would be unjust, especially in light of Ms. Roth's general challenge to the adequacy of the warnings she received as contained in her Statement of Material Facts.[9]

Second, in my view, the brochure received by Ms. Roth was neither specific enough nor sufficiently germane to Ms. Roth's situation to put her on notice as a matter of law.[10] The brochure does cite the risk of pelvic inflammation as one of the potential side effects of IUD use; however, it goes on to minimize that risk with respect to women with Ms. Roth's characteristics.[11] The brochure states that the increased risk of pelvic inflammation is "unconfirmed" and "appears to be greatest for young women who have never had a baby and/or who have many sexual partners." Because Ms. Roth had had a baby and had only one sexual partner, her future husband, Garland Roth, this warning did not adequately address the risk faced by women like Ms. Roth who did not fit into these categories. According to Searle's own internal memoranda, IUDs enhance the risk of contracting PID. See, *e.g.*, PX. 18. Indeed, Searle had deliberately tailored the brochure's language to minimize the appearance of risk to women such as Ms. Roth and had actually removed a section called "*ADVERSE REACTIONS*" which specifically warned of salpingitis and tubal damage or occlusion.[12] Although much of the informa-

---

9. The cases upon which the Court relies in refusing to consider Ms. Roth's argument are inapposite. In *Diercks v. Durham*, 959 F.2d 710, 713–14 (8th Cir.1992), the defendant-supervisor had argued in the District Court that the plaintiff-prisoner's admission of guilt obviated the risk of arbitrary decisionmaking. On appeal, she requested, for the first time, a reduction in the damage amount, alleging that the admission had severed the causal connection. In *Clarke v. Bowen*, 843 F.2d 271, 273 (8th Cir.1988), the petitioner argued for the first time on appeal that the denial of social-security benefits exceeded the scope of the District Court's prior remand order. Both of these cases involved completely separate issues of fact and law, as opposed to the subsidiary issue rejected by the Court today.

10. The Court quotes the brochure's language, *ante* at 1305, n. 2.

11. Ms. Roth argues on appeal that the brochure she received may not be the one Searle showed her during her deposition. Searle did release more than one patient brochure during the period it marketed the Cu–7; earlier brochures did not contain a warning of pelvic inflammatory disease, but later brochures did. Although Searle has not conclusively demonstrated that Ms. Roth received this particular brochure, since Ms. Roth did not challenge this assertion in her Statement of Material Facts as required by the District Court, I will assume, as does the Court,

that the brochure she received was this one. I do note, however, that if Ms. Roth did not receive this particular brochure, the case for reversal is even stronger.

12. The original warning proposed by Searle's medical staff read as follows:

> Pelvic infection: A three to five fold increased risk of pelvic inflammatory disease associated with the use of IUDs has been reported. This risk appears to be greatest for women who are nulliparous, who are under the age of 25, or who have had a multiplicity of sexual partners....
>
> *ADVERSE REACTIONS*
> Pelvic infection has been reported and may result in future infertility ... ADD TO LIST: Salpingitis, tubal damage or occlusion, fever. (PX. 38, App. 306). After the warning was edited, it read:
> Pelvic infections have been reported following insertion of a Cu–7.... Most infections can be eliminated by antibiotic therapy, but if not, the Cu–7 should be removed.
> An increased risk of pelvic infection associated with the use of IUDs has been reported. While unconfirmed, this risk appears to be greatest for young women who have never had a baby and/or who have many sexual partners.... Pelvic infection ... could decrease future chances of getting pregnant or even prevent it.

tion was still contained in the brochure, it was worded in such a way as to minimize potential problems and to make them seem as innocuous as possible.

Perhaps as important as the less-than-complete warnings in the Searle brochure is the fact that Ms. Roth's doctor, Dr. Kuncaitis, had no understanding of the actual side-effects of the Cu–7. Dr. Kuncaitis testified at his deposition that he did not understand that the IUD could cause such seriously damaging infections or that the IUD increased the risk of PID three to five fold. Kuncaitis Dep. 141. Had he understood these facts, he stated, he never would have prescribed the first IUD for Kimberly Roth, and, therefore, we can infer that he would not have prescribed the second. *Id.* at 142. In looking at these statements in the summary-judgment context, we take them as true, along with all reasonable inferences.

If Dr. Kuncaitis would not have prescribed the IUD for Ms. Roth had he understood the nature of the side-effects, it stands to reason that he was unable to warn Ms. Roth fully. A doctor cannot warn of dangers of which he is unaware. Furthermore, Dr. Kuncaitis stated that he did not remember the precise warnings he gave Ms. Roth (Kuncaitis Dep. 198–200, 73), but assumed that he had given her the "common" warnings. The content of the "common" warnings is uncertain, but it seems likely that they did not fully apprise Ms. Roth of the risk she faced. Additionally, the fact that Dr. Kuncaitis inserted another IUD in Ms. Roth despite the first infection could easily have lead Ms. Roth to believe that the IUD was not the cause of her problems, thus coloring her subsequent dealings with her doctors. That Dr. Kuncaitis thought it was all right to insert a second IUD could explain, in part, why Ms. Roth failed to make the connection between the IUD and her infections before 1988. Finally,

Ms. Roth was specifically told by her doctors that the first IUD was removed because it had shifted and was lodged in the uterus. Roth Dep. 117. This is also the explanation she was given for the pain she was experiencing. *Id.*

Third, the Court relies on Ms. Roth's failure to ask her doctors whether the IUD had caused her infection in its finding that she failed to conduct a reasonably diligent investigation. The Court specifically points to the warnings in the patient brochure and to the comment made by Dr. Carney as putting Ms. Roth on notice that she should investigate the link between the IUD and her infections.[13] The Court further states that since Dr. Beatty would have told her in 1986 that the infection was IUD-associated, meaning that it occurred while the IUD was inserted, her cause of action accrued, at the latest, that year.

The Court fails to mention several key facts in reaching this conclusion. First, as discussed above, the brochure did not give a full and accurate picture of the threat Ms. Roth faced; Dr. Kuncaitis's lack of understanding only made this deficiency worse. Second, Ms. Roth stated in her deposition that she asked the doctors why she was having recurring infections and what was causing them. The doctors continually told her that they did not know the source and merely continued to treat the infections with antibiotics. Roth Dep. 117, 145, 177–78. Third, Ms. Roth stated in her deposition that she had been told that she had an ovarian cyst. Since the pain she was experiencing was focused around her reproductive organs, she reasonably believed this explanation to be accurate. She was never told otherwise and continued to believe that a cyst was the cause of her problems. Roth Dep. 118, 138, 146–47. Fourth, Dr. Carney's comment that

Ms. Roth was under 25 when her IUD was inserted and was, therefore, greatly at risk of contracting PID because of her IUD use. However, Searle removed the portion of the warning that would have made this clear to her. Additionally, whatever her past circumstances, Ms. Roth was monogamous at the time the IUD was inserted and at all other times relevant to this litigation; therefore, the change from the past tense rendered the multiple-sexual-partners warning irrel-

evant to her. Finally, Searle removed a specific warning that salpingitis, or inflammation of the fallopian tube, a condition Ms. Roth ultimately developed, can result from IUD use and the resultant PID.

**13.** Dr. Carney stated, according to Ms. Roth, that she never should have had the second IUD inserted. Roth Dep. 133.

she should never have had the second IUD inserted is far from unambiguous. On the one hand, it could be saying, as the Court asserts, that the IUD was a potential cause; however, this comment could also mean that it was a mistake to insert the second one, given her previous infections. Additionally, at the time, Ms. Roth ascribed no particular significance to the comment because she still thought the problem was related to her ovaries. Roth Dep. 146. After the comment, Dr. Carney immediately left the room, giving Ms. Roth little opportunity to pursue the issue with him.[14] Fifth, she was in a great deal of pain and put her health in the doctors' hands. The doctors, for their part, did not tell her the nature of her infection, much less its cause. She was not given to understand that the IUD was the cause of her infections; she understood the first IUD had been removed because it had shifted and was given no explanation for the removal of the second IUD. Roth Dep. 146. Finally, by the time she met with Dr. Beatty in 1986 to discuss her options with regard to having more children, she had come to the conclusion that the doctors did not know what the source of the infections was or why she was continuing to have them, and that she had an ovarian cyst that was somehow causing her problem. Ms. Roth did not go to see Dr. Beatty until over two years after removal of her second IUD, and Dr. Beatty appears to have been the first doctor to diagnose Ms. Roth's chronic PID. See Beatty Dep. 65 and Kuncaitis Dep. 58–59. Whether by that point in time it was unreasonable, given her past experiences, for Ms. Roth not to ask Dr. Beatty about the cause of her infections is not clear as a matter of law. Rather, it is a question for the finder of fact whether facts existed in 1986 that were sufficient to put Ms. Roth on notice of her claims.

Not only is it unclear that Ms. Roth should have been on notice that she needed to conduct a more diligent investigation, it is uncertain what she would have learned had she asked Drs. Carney and Beatty. There is nothing in Dr. Carney's medical report to demonstrate what Dr. Carney would have said had Ms. Roth asked for clarification. See PX. 13. She in fact did ask both Dr. Kuncaitis and Dr. Wilson what was causing her problems but to no avail. Roth Dep. 144. In her deposition, Dr. Beatty stated that she would have told Ms. Roth that the infection was IUD-associated if asked, but specifically noted that she was saying only that the infection occurred while the IUD was *in situ*. She would not state, and in fact could not state at that time, that the infection was caused by the IUD itself. Beatty Dep. 26–27. Whether Dr. Beatty's statements alone would have been sufficient to put Ms. Roth on notice of her claim is questionable, given Dr. Beatty's hesitancy to point out the IUD as the source of the problem. Nonetheless, even if Dr. Beatty's answers would have been sufficient, Ms. Roth's failure to ask may have been reasonable, as previously discussed.[15]

## II.

Under Iowa law, the statute of limitations can be tolled on one of two theories, fraudulent concealment or equitable estoppel. The Roths assert that both of these theories apply to Ms. Roth's situation, a position the Court rejects. The Roths first argue that Searle's fraudulent concealment of facts surrounding the relationship between the Cu–7

14. Dr. Carney was the doctor in the emergency room at Grinnell Hospital. He and Dr. Kuncaitis had an arrangement to care for one another's patients when the other was out of town. Ms. Roth's only contact with Dr. Carney was at Grinnell; she never spoke with him again. However, she did ask Dr. Kuncaitis why she was continuing to have infections, and he was unable to tell her the cause. Roth Dep. 144.

15. The District Court and this Court both note as an undisputed fact that there was a great deal of publicity surrounding the Cu–7 and Searle's removal of the IUD from the market during the mid–1980s. However, the fact of publicity is irrelevant if Ms. Roth was unaware of it. She stated in her deposition that she did not read women's magazines and that she had not seen any news reports or read any news articles about the Cu–7 controversy until she saw the CNN news story in 1988. Roth Dep. 185. In addition, none of the newspaper clippings presented to this Court or to the District Court appeared in Iowa newspapers. It is entirely possible that Ms. Roth never saw an article on the Cu–7 controversy until 1988. Finally, I note that many of the articles in the record, unlike the CNN story that prompted this suit, did not describe symptoms with any specificity.

and PID tolls the statute of limitation. The Iowa courts recognize that statutes of limitation may be tolled if a cause of action is fraudulently concealed by the defendant. In order to avail herself of this doctrine, however, Ms. Roth must have conducted a diligent investigation to discover her cause of action. *Pride v. Peterson,* 173 N.W.2d 549, 555 (Iowa 1970).

The Court concedes that, if one reads the facts in the light most favorable to the Roths, there is some evidence that Searle attempted to suppress the relationship of the Cu–7 to PID and infertility. *Ante* at 1308. The Court goes on to cite evidence to the contrary—the previously discussed brochure, as well as the fact that some of the doctors may have been aware of the link in 1984 and 1986—but assumes for the sake of discussion that the evidence meets the first element of fraudulent concealment. In fact, the evidence indicates that Searle had "retained unto itself the unpermitted option" of filtering toxicity data which the FDA considered to be relevant. See, *e.g.,* PX. 40. In addition, one of the doctors who participated in Searle's clinical studies was critical of Searle's research methods and suggested that, contrary to Searle's flat assertion that infection rates were below 1%, see PX. 17, the methodology was so flawed that it was impossible "to really come out with accurate and true estimates of the incidence of infection." See Sweet Dep. 797, PX. 28. He further indicated cases that were clearly PID were miscategorized in the final Searle study. *Id.* at 783–96. The brochure, as discussed previously, is a pale reflection of the risk, arguably insufficient to counter the misinformation Searle fed to doctors and, by extension, to patients. Ultimately, however, the Court fails to note that if the evidence could be sufficient to support the first requirement for a claim of fraudulent concealment, then the summary-judgment standard is met. It is not important to our analysis here whether Ms. Roth has established fraudulent concealment to the satisfaction of this panel.

The Court rejects Ms. Roth's fraudulent-concealment claim because it holds that she failed to meet the second part of the test, that is, she did not conduct a reasonably diligent investigation into her cause of action. In so holding, the Court points to the same facts surrounding its determination of when the cause of action accrued, that is, Ms. Roth's failure to ask her doctors. As discussed previously, Ms. Roth did, in fact, ask her doctors what the cause of her problem was and was given no information that would lead her to connect her infections to the IUD. Additionally, the record contains documents and internal Searle memoranda that demonstrate that Searle provided doctors and the FDA with incomplete information concerning toxicity and the connection between the Cu–7 and PID, so what Ms. Roth would have learned had she continued to ask is far from clear. See PX. 40, and Sweet Dep. 783–96; compare PX. 17 with PX. 18.

In *Kociemba v. G.D. Searle & Co.,* 680 F.Supp. 1293 (D.Minn.1988), the District Court for the District of Minnesota faced the same question on similar facts. In *Kociemba,* the plaintiff was fitted with a Cu–7 IUD. She contracted PID and had the IUD removed, but was, nonetheless, rendered infertile by the disease. Like Ms. Roth, Ms. Kociemba saw several doctors in an attempt to uncover why she could not have children; she was told, ultimately, that her fallopian tubes were blocked. However, unlike Ms. Roth, she asked none of the doctors why she was infertile or what was causing her infections. It was not until five years later, when she met with a Dr. Kreider, that Ms. Kociemba discovered a connection between her infertility and the IUD, and then only because Dr. Kreider explicitly told her there might be. In holding that there was a material issue of fact as to whether Searle fraudulently concealed Ms. Kociemba's cause of action, the District Court pointed to the extensive evidence supporting allegations that Searle concealed information. *Id.* at 1302. The *Kociemba* Court's decision to deny Searle's summary-judgment motion reflects a well-reasoned determination that a material issue of fact exists with respect to Searle's fraud.[16] In the present case, Ms. Roth did

**16.** In light of the Court's apparent disbelief that a case can be made for fraudulent concealment

under these circumstances, we note that the jury

ask her doctors what was causing her infections early on in her treatment, but was given no information. She claims she learned of the connection from a CNN broadcast. Like Ms. Kociemba, it was not until the connection was pointed out to her that she understood that she might have a cause of action.

A jury could find that Searle deliberately concealed information connecting the Cu–7 to PID, and that Ms. Roth conducted a diligent investigation of the facts surrounding her cause of action. Therefore, she has made the threshold showing necessary to withstand Searle's motion for summary judgment on the issue of fraudulent concealment.

The Court also rejects the Roths' equitable-estoppel claim: it holds, first, that Iowa law requires that misrepresentations be designed to lead the plaintiff into the "trap of the time bar"; second, that the Roths failed to demonstrate that Searle had this result as its goal when it made its misrepresentations; and third, that the record "contains evidence sufficient to raise substantial doubts" as to whether the Roths knew of the link between the Cu–7 and Ms. Roth's infections, which knowledge would damage her claim of fraud. *Ante* at 1309. In finding that Iowa law requires a specific misrepresentation designed to lead the plaintiff into sitting on her rights, the Court relies on *Meier v. Alfa–Laval, Inc.,* 454 N.W.2d 576 (Iowa 1990). However, the tenet that equitable estoppel is not available unless the misrepresentation was intended to lead the plaintiff into the "trap of the time bar," is taken out of the context that prompted the *Meier* Court to adopt it.

In *Meier,* the issue was whether a repair, coupled with verbal assurances that the repair had fixed the problem, could be misrepresentation sufficient to meet the first of the equitable-estoppel requirements. The Iowa Supreme Court dubbed this argument "repair estoppel" and addressed it as an "offshoot" of the general doctrine of equitable estoppel. After discussing the various positions taken by other courts on the issue of when a poorly done repair equals misrepresentation, the Iowa Court decided upon the

narrow test referred to by this Court today. The Iowa Court looked to its own policy in originally adopting the doctrine of equitable estoppel and stated that repairs do not rise to the level of deception even when accompanied by assertions that they will cure the defect. Because of this determination, it is insufficient under Iowa law to show that the repair failed to solve the problem. Given the context of the *Meier* decision, I do not believe the Iowa Supreme Court would extend such a narrow view of the availability of the equitable-estoppel doctrine across the board.

Even if the Court is correct that Iowa law would require a specific showing that the misrepresentations were designed to trick the plaintiff into sitting on her rights, the Roths do not claim, contrary to the Court's assertion, *ante* at 1309, that "virtually any false representation or concealment of facts relevant to the case satisfies" the fraud element of an estoppel claim. The Roths assert, specifically, that Searle concealed from Ms. Roth and her doctors the fact "that nonsexually transmitted pelvic inflammatory infections were a significant side effect of use of the Cu–7." Brief for Appellants 20. The Roths allege that Searle intended doctors and patients to rely on false information supplied by Searle because so long as they did, "Searle would be safe from suit and from liability for its defective products." *Id.* The Roths clearly claim that Searle's misrepresentations were designed to avoid having to defend a lawsuit based on injuries caused by the Cu–7. For all intents and purposes, this is the same as alleging that Searle wanted to "trap" the Roths with a time bar. There is evidence that Searle misled doctors and patients with the express purpose of obfuscating the connection between PID and the Cu–7. Whether Searle's misrepresentation should be sufficient to support a claim of equitable estoppel, and whether Ms. Roth relied on those misrepresentations to her detriment, are issues of fact best left to a jury to determine.

### III.

Several issues of material fact exist as to what Ms. Roth knew, as well as to when she

in *Kociemba* found against Searle on fraudulent concealment grounds. See PX. 43.

either knew or should have known it. It is far from clear from the record that Ms. Roth should have continued to ask her doctors about the cause of her infections and infertility, given the lack of information she received from her doctors even when she did ask. Ms. Roth was given an alternate source of her injuries, an ovarian cyst, that she believed to be the cause of her problem until she saw the CNN newscast in 1988. Because it is not clear that Ms. Roth should have been on notice of her claims in 1986, I think there is an issue of material fact as to whether the statute of limitations is tolled by Searle's fraud. Finally, there is an issue of material fact as to the purpose and result of Searle's misrepresentations with respect to the Cu–7.

This case should go to trial.