**Priscilla M. WAITEK and Marc Waitek, Plaintiffs,**

v.

**DALKON SHIELD CLAIMANTS TRUST, Defendant.**

No. C 85-3051.

United States District Court, N.D. Iowa, Central Division.

Dec. 8, 1995.

W.E. Kunze, Castle Rock, Colorado, and Dick H. Montgomery of Montgomery, Barry & Bovee, Spencer, Iowa, for plaintiffs.

Robert D. Houghton of Shuttleworth & Ingersoll, P.C., Cedar Rapids, Iowa, and Robert C. Tucker of Arter & Hadden, Cleveland, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER REGARDING MOTION FOR SUMMARY JUDGMENT

### TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND .................................. 674
II. STANDARDS FOR SUMMARY JUDGMENT ........................... 675
III. FINDINGS OF FACT ............................................... 677
 A. Uncontested Facts ............................................. 677
 B. Contested Facts .............................................. 678
IV. CONCLUSIONS OF LAW .......................................... 678
 A. Statute of Limitations ........................................ 678
 B. Proximate Cause of Priscilla Waitek's Injuries ................. 683
 C. Compliance with Scheduling Order ............................ 686
V. CONCLUSION ................................................... 688

BENNETT, District Judge.

A nulliparous plaintiff, who had hoped she would not remain so, and her spouse filed this product liability lawsuit with Hydra-like claims arising out of her use of a Dalkon Shield Intrauterine Device ("IUD") in the 1970's.[1] Defendant's motion for summary judgment raises two issues. First, Defendant's motion raises the issue of whether Plaintiffs' claims are barred by the statute of limitations. Second, it raises the question of whether Plaintiffs can establish that Plaintiff Priscilla Waitek's use of the Dalkon Shield IUD caused the medical problems for which she and her husband have filed suit.

### I. INTRODUCTION AND BACKGROUND

Plaintiffs Priscilla Waitek and Marc Waitek ("the Waiteks") originally filed their petition in the Iowa District Court for Cerro Gordo County on April 5, 1985. In their petition, the Waiteks asserted claims against Defendant A.H. Robins Company ("Robins"), the manufacturer of the Dalkon Shield IUD, for negligence, strict liability, breach of implied and express warranties, fraud, and infliction of emotional distress. On May 4, 1985, Robins removed the action to this court.[2] On August 21, 1985, this case was stayed, pursuant to 11 U.S.C. § 362(a), when Robins filed a voluntary petition, under Chapter 11 of the United States Bankruptcy Code, Title 11 U.S.C., in the United States

---

1. IUDs are "pieces of plastic or metal of various shapes (*e.g.* coil, loop, bow) inserted into the uterus to exert a contraceptive effect." Stedman's Medical Dictionary at 470 (26th ed. 1995).

2. The original Defendant in this case, Robins, removed the action to this court based on diver-

sity of jurisdiction pursuant to 28 U.S.C. § 1441. According to the petition, the Waiteks are citizens of Iowa while Robins is a corporation organized under the laws of the State of Virginia with its principal place of business in Richmond, Virginia.

Bankruptcy Court for the Eastern District of Virginia. On July 25, 1988, the Bankruptcy Court confirmed a plan of reorganization ("the Plan"). As part of the Plan, the Defendant Dalkon Shield Claimants Trust ("the Trust") was established to administer the distribution of a fund for Dalkon Shield IUD claimants. The Waiteks completed the claims process and, on July 10, 1994, were certified by the Bankruptcy Court to resume their litigation in accordance with Amended Administrative Order Number 1 Governing Dalkon Shield Arbitration and Litigation.[3] On September 15, 1994, the Waiteks amended their complaint in this action to comply with Amended Administrative Order Number 1 Governing Dalkon Shield Arbitration and Litigation by substituting the Trust for Robins. In their First Amended Complaint, the Waiteks asserted claims for negligence, strict liability, breach of implied and express warranties, fraud, and infliction of emotional distress.

The Trust has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(b) on the Waiteks' claims. The Trust asserts two grounds for the court to grant summary judgment. First, the Trust argues that Plaintiffs' claims were not timely filed under Iowa because Patricia knew or should have known about her injuries and their possible connection to the Dalkon Shield IUD no later than January 10, 1983, when Priscilla was seen by Dr. Tiffany Williams at the Mayo Clinic. Second, the Trust asserts that Plaintiffs cannot establish a causational nexus between Priscilla's use of the Dalkon Shield IUD and the fertility problems for which she and her husband have filed suit.

A hearing on the Trust's Motion for Summary Judgment was held on December 4, 1995. At the hearing the Waiteks were represented by W.E. Kunze, Castle Rock, Colorado, and Dick H. Montgomery of Montgomery, Barry & Bovee, Spencer, Iowa. The Trust was represented by Robert D. Houghton of Shuttleworth & Ingersoll, P.C., Cedar Rapids, Iowa, and Robert C. Tucker of Arter & Hadden, Cleveland, Ohio. The parties have filed thorough and extensive briefs in support of their respective positions. Counsel were exceptionally well prepared for oral argument. Oral argument was spirited, informative, and immensely helpful to me in resolving the two nettlesome issues raised by the Trust. This matter is now deemed fully submitted.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini,* 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)); *Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir. 1992).

 The standard for granting summary judgment is well established. *Rule 56* of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may; at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and ad-*

---

**3.** A copy of Amended Administrative Order Number 1 Governing Dalkon Shield Arbitration and Litigation is attached as Exhibit A to the Waiteks' First Amended Complaint.

*missions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

Fed.R.Civ.P. 56(b) & (c) (emphasis added); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir.1995); *Munz v. Michael*, 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.*, 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone*, 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini*, 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[4] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here the Waiteks, and give them the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Munz v. Michael*, 28 F.3d 795, 796 (8th Cir.1994); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.*, 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene*, 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield*, 939 F.2d 666, 667 (8th Cir.1991), *cert. denied*, 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

Procedurally, the moving party, the Trust, bears "the initial responsibility of informing the district court of the basis for their motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see also Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir.1993). The Trust is not required by *Rule* 56 to support its motion with affidavits

or other similar materials negating the opponent's claim. *Id.*

"When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355. The Waiteks are required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed. R.Civ.P.* 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach*, 49 F.3d at 1325. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Products, Inc. v. Herrick*, 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir.1994).

In *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510, *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2553, and *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and

4. An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394.

determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel*, 953 F.2d at 396 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). If the Waiteks fail to make·a sufficient showing of an essential element of a claim with respect to which they have the burden of proof, then the Trust is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Woodsmith*, 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Burk*, 948 F.2d at 492; *Woodsmith*, 904 F.2d at 1247. With these standards in mind, the court turns to consideration of the Trust's motion for summary judgment.

## III. FINDINGS OF FACT

### A. Uncontested Facts

For the purposes of this summary judgment motion only, the court finds the following facts:

The record reveals that the following facts are undisputed. Plaintiff Priscilla M. Waitek was born on January 28, 1952. Priscilla is employed as the Director of Health Works, Occupational Medicine Services for North Iowa Mercy Health Center. Priscilla married Plaintiff Marc Waitek on August 17, 1974. Marc is employed ·as a physician's assistant in family practice at St. Joseph Hospital in Mason City, Iowa. The Waiteks have two adopted children.

In 1970, Priscilla graduated from Sioux Center High School. She attended the University of Northern Iowa for four years, 1970 through 1974. In 1970, Priscilla chose birth control pills as a method of contraception. She used birth control pills for approximately

one year but because of side effects terminated their use. After Priscilla stopped using birth control pills, she started using spermicidal cream and condoms. For approximately two years, from 1971 to 1973, she used spermicides and condoms as her method of contraception. In 1973 Priscilla became pregnant. That pregnancy resulted in a miscarriage.

In April 1974, Priscilla obtained a prescription for an IUD. She went to Family Planning and asked for a Dalkon Shield IUD. She was told that she might experience some increased cramping, a heavier flow, and that she needed to check the IUD's string periodically. Priscilla was also aware at the time that she received the Dalkon Shield IUD that some women could not wear IUDs. Following placement of the Dalkon Shield IUD, Priscilla experienced some discomfort for between two and ·four days. Throughout the time that she first wore an IUD, she experienced some heavier bleeding and some additional cramping. Priscilla attributed her additional cramping to having an IUD in place.

In January of 1977, Priscilla saw Dr. R. Bruce Dunker for an·annual check up. She wanted Dr. Dunker to check the Dalkon Shield IUD because she was uncomfortable and questioned whether she had exceeded the life span of the IUD. Dr. Dunker informed Priscilla that IUDs had to be replaced periodically and that it was time for her Dalkon Shield IUD to be replaced. Priscilla discussed the use of a diaphragm as a birth control option with Dr. Dunker. Priscilla opted against using a diaphragm. Dr. Dunker removed the Dalkon Shield IUD from Priscilla and replaced it with a Copper 7 ("Cu–7") IUD.

In November of 1977, Priscilla sought medical attention for pelvic pain·and prolonged bleeding. On November 10, 1977, Priscilla was seen by Dr. Hall. Dr. Hall prescribed medication for Priscilla which would counteract any infection that Priscilla might be experiencing.[5] On November 28, 1977, Priscilla was seen by Dr. Dunker. She was concerned about being able to continue

---

5. The record reflects that the medication which was prescribed by Dr. Hall on November 10, 1977, was the antibiotic, Ampicillin.

wearing an IUD and was considering having it removed. Priscilla was aware that the continued use of an IUD could have an effect upon a woman's future fertility. On that visit Priscilla had Dr. Dunker remove the Cu–7 IUD, and fitted Priscilla with a diaphragm. That was Priscilla's last visit with Dr. Dunker.

In late 1978 or early 1979, the Waiteks decided to start a family. In early 1979, Priscilla became pregnant. She, however, suffered a miscarriage. Priscilla experienced a second miscarriage during the summer of 1979. As a result of these two miscarriages, Priscilla was seen by Dr. Beverley Robinson to investigate a gynecologic condition known as habitual abortion. Dr. Robinson performed an examination and recommended that a hysterosalpingogram be performed in Mason City.[6] Dr. Robinson suggested that Priscilla have follow up visits with Dr. Gene Kuehn. On December 13, 1979, a hysterosalpingogram was performed on Priscilla in Mason City.[7] The results of the hysterosalpingogram were normal.[8] The Waiteks were separated from October of 1981 until April of 1982.

In May and August 1982, Priscilla experienced ectopic pregnancies.[9] Dr. Kuehn treated Priscilla for the first ectopic pregnancy. Dr. Kuehn and Dr. Moeller treated her for the second ectopic pregnancy. After her second ectopic pregnancy, Priscilla was referred by Dr. Kuehn to Dr. Tiffany Williams at the Mayo Clinic. On January 10, 1983, Priscilla was seen by Dr. Williams at the Mayo Clinic. Priscilla's medical history was taken by Dr. Williams. The clinical history record for Priscilla dated January 10, 1983 includes, *inter alia*, the following notation:

"1973 to 1977 IUD Dalkon Shield—had removed because of pain and possible infection."[10] Priscilla underwent a tuboplasty at the Mayo Clinic.[11]

On April 7, 1983, Priscilla saw Dr. Mary Waziri at the Regional Genetic Counseling Clinic in Mason City, Iowa. Dr. Waziri took a detailed history from Priscilla and was told of Priscilla's Dalkon Shield use. Dr. Waziri told Priscilla that her use of the Dalkon Shield might account for Priscilla's pregnancy and fertility problems. In August 1984, Priscilla had a third ectopic pregnancy.

Priscilla has never been diagnosed as having any sexually transmitted disease. Since first commencing an intimate relationship with Marc in December 1973, Priscilla has not had sexual intercourse with any other person. Marc has not been sexually active with any other woman since he met Priscilla.

### B. Contested Facts

1. When did Priscilla know or should she have known about her injuries and their possible connection to the Dalkon Shield IUD?

2. Whether on January 14, 1977, when Priscilla had the Cu–7 IUD inserted, she was given a brochure or card, or any written or oral information by Dr. Dunker informing her of the risks associated with the Cu–7.

## IV. CONCLUSIONS OF LAW

### A. Statute of Limitations

This case, before this court on diversity jurisdiction, is controlled by Iowa law. The Trust moves for summary judgment on all counts of Waiteks' First Amended Complaint on the ground that their claims are

---

6. The Trust's Statement of Undisputed Facts incorrectly states that Dr. Robinson performed the hysterosalpingogram.

7. Hysterosalpingography is "[r]adiography of the uterus and the fallopian tubes after the injection of radiopaque material." Stedman's Medical Dictionary at 843.

8. A copy of the results of Priscilla's December 13, 1979, hysterosalpingogram is the Trust's Exhibit H. It states that:

 There is good visualization of the uterus. Uterus appears normal in size and configuration. No Seta are seen. The Tubes fill and are patent bilaterally.
 IMPRESSION: Normal hysterosalpingogram.

9. An ectopic pregnancy is a pregnancy "occurring elsewhere than in the cavity of the uterus." Stedman's Medical Dictionary at 542.

10. The January 10, 1983, clinical history is the Trust's Exhibit·D.

11. Tuboplasty or salpingoplasty is plastic surgery of the fallopian tubes. Stedman's Medical Dictionary at 1568, 1869.

barred by the two-year statute of limitations found in Iowa Code § 614.1(2).[12] Thus, the first issue the court must address is whether the statute of limitations expired before the Waiteks brought suit. The Waiteks contend that their suit is timely under the Iowa discovery rule. The Trust, however, contends that the Waiteks knew of the existence of Priscilla's injuries, and either knew or should have known of their potential claims as early as November 1977 when Priscilla's Cu–7 IUD was removed, and no later than January 10, 1983 when Priscilla first saw Dr. Robinson at the Mayo Clinic about her problems. The Waiteks contend that the Iowa discovery rule for injuries related to a defective product extends the statute of limitations in this case, and that a genuine issue of material fact exists concerning Priscilla's knowledge of the causal relationship between her injuries and her Dalkon Shield use.

It is undisputed that the two-year limitation provided in Iowa Code section 614.1(2) applies to all of the Waiteks' claims because all are based on injuries to the person. *Franzen v. Deere and Co.*, 334 N.W.2d 730, 733 (Iowa 1983). Therefore, the issue is whether the Waiteks' claims were discoverable more than two years before April 5, 1985.

As the Eighth Circuit pointed out last year:

> Under Iowa law, the "statute of limitations begins to run when the injured person discovers or in the exercise of reasonable care should have discovered the allegedly wrongful act." *Franzen v. Deere & Co.*, 377 N.W.2d 660, 662 (Iowa 1985). Actual knowledge of one's injury or claim is not required. *Sparks v. Metalcraft, Inc.*,

408 N.W.2d 347, 351 (Iowa 1987). "The statute begins to run when the person gains knowledge sufficient to put him on inquiry." *Id.* Once the plaintiff gains such knowledge, the "plaintiff is charged with knowledge of facts that would have been disclosed by a reasonably diligent investigation." *Id.* Moreover, "the duty to investigate does not depend on exact knowledge of the nature of the problem that caused the injury." *Franzen*, 377 N.W.2d at 662. Rather, "[i]t is sufficient that the person be aware that a problem existed." *Id.*

*Roth v. G.D. Searle & Co.*, 27 F.3d 1303, 1306 (8th Cir.1994).[13]

The Trust points to statements in Dr. Dunker's deposition testimony as evidence that Priscilla was placed on inquiry notice as to the causal link between the Dalkon Shield IUD and her injuries by November of 1977 when Priscilla had the Cu–7 IUD removed. Although Dr. Dunker did not have any specific recollection of his discussion on January 14, 1977, with Priscilla, Dr. Dunker testified, based on his review of his records, as follows:

Q. You then go on here in your note to say that the patient was counseled about the risks of the IUD, comma, failure rates, comma, and she elected to go ahead with the Cu–7.

A. Um-hm.

Q. With respect to counseling, Doctor, about the risks of the IUD and the failure rates of the IUD, I'm assuming first with respect to pregnancy you would have told her that it was more effective at preventing pregnancy than the diaphragm?

A. Oh, yes.

---

12. Iowa Code section 614.1(2) provides in pertinent part that:

> Actions may be brought within the times herein limited, respectively, after their causes accrue, and not afterwards, except when otherwise specially declared:
>
> . . . . .
>
> Injuries to person or reputation—relative rights—statute penalty. Those founded on injuries to the person or reputation, including injuries to relative rights, whether based on contract or tort, or for a statute penalty, within two years.

13. Although the Waiteks argued at the hearing that the Iowa Supreme Court's recent decision in *Frideres v. Schiltz*, 540 N.W.2d 261, 269 (Iowa 1995), modified Iowa's discover rule, the court's review of the *Frideres* decision does not lead it to reach the same conclusion. In *Frideres*, the Iowa Supreme Court stated that "[t]he common law discovery rule requires that the plaintiff know or in the exercise of reasonable care should have known both the fact of the injury and its cause." *Id.* The court does not read this passage from *Frideres* to in any way alter Iowa's discovery rule.

Q. And in fact she had probably knew that because she had already used an IUD, correct?

A. Three years, yes.

Q. In terms of discussing with her the risks of using an IUD, do you recall that with the Copper 7 there was a patient brochure, a little booklet that you could hand out with that IUD?

A. Um-hm. Always did.

Q. So that was something that was always a part of your counseling practice with your patients?

A. It was, yes.

Q. In the course of counseling patients on using the Copper 7, would you have had them read that so that they could ask you any questions?

A. Oh, yes. Yes. And generally what we did is we talked about—we took a history, they decided that they wanted an IUD, I would hand them the booklet, they would go ahead and disrobe in the exam room and put a gown on and read the booklet while they were waiting for me to come back. And I would be seeing another patient at the time.

Q. And then in the course of counseling them on the risks of the IUD, Doctor, I'm assuming that you would have counseled them specifically about the risk of pelvic infection with IUDs?

A. I would have.

Q. So that in January of 1977 here where you note that Mrs. Waitek was counseled about the risks of the IUD, part of that counseling would have been that there is a risk of having an infection of your fallopian tubes or your ovaries if you use an IUD?

A. Um-hm. Particularly we emphasize that in nulliparous females—she was not nulliparous, but—yeah, she was nulliparous, sorry. And we said IUDs in women who have never borne children, we were concerned about the risk of interfering with fertility, future fertility.[14]

Q. So that those in sum and substance are the words that you would have used in counseling Mrs. Waitek about the use of the Copper 7 IUD?

A. I would have said to her that there is a risk of pelvic infection that could result in sterilization and inability to conceive in the future and usually played it down as a low risk—because we believed it to be a low risk at that time.

Q. But a risk, nonetheless, that you thought important to pass on to the patient and in fact did pass on to your patients?

A. Oh, yes. Yeah.

Dr. Dunker Dep. at 62–65. The Trust further points to the following deposition testimony of Priscilla as evidencing her knowledge between IUD use and infertility:

Q. Did you ask Dr. Dunker what was causing your problems?

A. I don't remember what I asked him. I remember I was concerned about being able to continue wearing an IUD, and considering having it removed. I was continuing to be uncomfortable.

Q. In fact, Dr. Dunker told you to have the IUD removed, didn't he?

A. I don't believe he told me I had to remove it. I think he advised me that it was—you know, it was not good for women who wanted—who were fertile, wanted to have children, to continue to wear an IUD for a long period of time; if I was having problems with it, I should look at other forms of birth control.

Q. And as a result of this discussion you knew that wearing an IUD could have an effect upon future fertility, right?

A. Yeah. I was aware that it wasn't something you wanted to continue to

14. Nulliparous means "[n]ever having borne children." Stedman's Medical Dictionary at 1230.

use for ever and ever, if you wanted to have children, yes.

Priscilla Waitek Dep. at 175–76. Finally, the Trust points to the following notation in the clinical history record for Priscilla dated January 10, 1983: "1973 to 1977 IUD Dalkon Shield—had removed because of pain and possible infection."

The court finds that these three references raise the specter that Priscilla had some knowledge regarding IUD use and its possible side effects. However, the court further concludes that the Waiteks have, as required under Rule 56(e), gone beyond the pleadings, and by affidavit designated "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325.

In contrast to Dr. Dunker's deposition testimony, Priscilla stated in her affidavit that

At the time I had the Copper 7 IUD inserted on January 14, 1977 I do not remember or have any recollection of being given any brochure or card or any written or oral information which advised me of the risks or any problem I might experience with the Copper 7. I was not advised and certainly did not understand that the Copper 7 could cause infertility, scarring of the fallopian tubes, ectopic pregnancies or any of the other female problems I ultimately experienced.

Priscilla Waitek Aff. at 2. She goes on to aver that:

I was finally able to see Dr. Mary Waziri at the Regional Genetic Counseling Clinic in Mason City, Iowa, on April 7, 1983. She took a detailed history from me and I told her of my use of the Dalkon Shield from April 11, 1974 until January 14, 1977; that I had experienced some cramping, abdominal pain and infections from time to time while using the Dalkon Shield. At that time, Dr. Waziri expressed the thought to me that perhaps the Dalkon Shield was related to all my pregnancy and fertility problems. This was the first time that anyone had told me or alerted me to the fact that the Dalkon Shield may have been related to my medical problems, including

infections, miscarriages, adhesions, scarred tubes, ectopic pregnancies and infertility problems. (Letter of Dr. Mary Waziri dated 5/3/83 attached and marked Exhibit 16). It was at this time, after being advised by Dr. Waziri that I began to investigate the Dalkon Shield and its causal relationship to my medical problems. At no time prior to April 7, 1983 did I have any reason to suspect the Dalkon Shield might be the cause of all my medical problems as set out above.

I felt devastated and remorseful and really felt let down after Dr. Waziri told me my problems may be related to my use of the Dalkon Shield. I had been experiencing all these physical problems and some emotional problems over my inability to have a child for a number of years and no one, including all of the doctors that treated me, ever gave any indication to me that the Dalkon Shield may be the cause of my problems. I felt very low at this point and wasn't sure what I should do.

Dr. Waziri's comments prompted me to investigate whether the Dalkon Shield could be the cause of my problems.

I still recall quite clearly my reaction to the comments regarding the possible relationship between the Dalkon Shield and my problems. I was stunned that my problems might have resulted from something I had voluntarily done. I am confident I would not have reacted in this fashion if before that day I had had any hint of a causal relationship between the Dalkon Shield and any IUD and the problems I was experiencing.

Priscilla Waitek Aff. at 5–6.

The court concludes that Priscilla's affidavit places at issue the caliber of warning she had previously received concerning the Dalkon Shield. Thus, several issues of material fact exist as to what Priscilla knew, as well as to when she either knew or should have known about her injuries and their possible connection to her use of a Dalkon Shield. These issues of fact must be left to a jury to determine.

The Trust's citation to the Eighth Circuit's decision in *Roth* is unpersuasive authority

given the factual dissimilarities between *Roth* and this case. In *Roth*, the District Court for the Southern District of Iowa faced a similar question. In *Roth*, the plaintiff was fitted with a Cu-7 IUD, not a Dalkon Shield IUD, after receiving and reading a patient brochure on the Cu-7. *Roth*, 27 F.3d at 1305. She subsequently contracted Pelvic Inflammatory Disease ("PID") and had the Cu-7 IUD removed. *Id.* The plaintiff in *Roth* saw several physicians in an attempt to uncover why she could not have children. She ultimately learned that she was rendered infertile by PID. *Id.* at 1306. The district court held that the undisputed facts show " 'that [Ms.] Roth knew facts sufficient to put her on inquiry notice, and reasonable inquiry would have led her to discover her potential claims against the defendant before March 3, 1987.' " *Id.* at 1306–07. As the Eighth Circuit noted, the district court recounted several facts in support of its position:

> First, the court stated that Dr. Kuncaitis gave Ms. Roth a "detailed patient brochure warning of PID," which she "briefly read through." Slip op. at 7 [*Roth v. G.D. Searle & Co.*, 1992 WL 672905]. The court also found undisputed evidence that Dr. Kuncaitis warned Ms. Roth of at least some IUD-associated risks and that Dr. Carney informed her that she never should have had a second IUD inserted. *Id.* Moreover, the court emphasized that had the Roths asked Dr. Beatty about the cause of her pelvic inflammatory disease,

she would have learned that her condition was "IUD associated." *Id.* Finally, the court acknowledged the "considerable media publicity" during the mid–1980s highlighting Cu-7 litigation and the possible link between IUDs and pelvic inflammatory disease.

*Id.* at 1307.

Here, in stark contrast to the factual situation found in *Roth*, Priscilla was not given any warning, either written or oral, regarding the Dalkon Shield at the time of either its insertion, or removal. Furthermore, the Waiteks indicate that Priscilla cannot recall being given a patient brochure on the Cu-7 by Dr. Dunker. At minimum, this creates a genuine issue of material fact as to whether Dr. Dunker gave Priscilla a brochure. Additionally, unlike the situation in *Roth*, in which the patient brochure was introduced as an exhibit, thereby permitting the court to gauge the nature and scope of the warning contained in it, *see Roth*, 27 F.3d at 1308, the specifics of any patient brochure employed by Dr. Dunker are unknown here. It is also disputed whether Dr. Dunker orally warned Priscilla of IUD-associated risks. Another distinguishing factor here is that the record does not indicate that had Priscilla asked any of her treating physicians prior to Dr. Waziri about the cause of infertility problems, she would have learned that her medical problems were related to her use of the Dalkon Shield.[15] Finally, unlike the factual situation

15. During the hearing the Trust made repeated mention of that portion of Priscilla's deposition in which she acknowledged her IUD use, and that the IUD had been removed because of pain and possible infection. Priscilla testified as follows:

> Q. You don't know if you mentioned Dalkon Shield—
> A. I don't know if he had any other records or—I don't know. I mean, I must have—I don't remember saying that that's what I had at the time, because, I mean, that was something I wasn't certain I had at that time, in my history.
> Q. Putting aside the Dalkon Shield part of this, you knew you'd had an IUD?
> A. I knew I had an IUD, yes, I knew that, and I knew that I had—
> Q. And that the IUD had been removed because of pain and possible infection?
> A. Right.

> Q. So that's the information you would have passed on to Dr. Williams at that time?
> A. Right. But the date was '74—the date was wrong when I started the use.

Priscilla Waitek's Dep. at 194. From this passage, the Trust draws the conclusion that Priscilla knew facts sufficient to put her on inquiry notice, and reasonable inquiry would have led her to discover her potential claims against the Trust. The court disagrees with that conclusion. It erroneously assumes that Priscilla's knowledge of her IUD use and a possible subsequent infection should have alerted her to a causal nexus between the possible infection and her infertility problems. Given the difficulty with which learned members of the medical community have in identifying PID and its cause in a particular patient, as amply demonstrated by Dr. Dunker's deposition testimony on the subject, the court cannot say that as a matter of law that a lay person, such as Priscilla, was placed on inquiry notice by the mere fact that she was cognizant of

in *Roth,* in which the district court there acknowledged the "considerable media publicity" during the mid–1980s concerning Cu–7 litigation and the possible link between IUDs and pelvic inflammatory disease, the record here is devoid of any evidence regarding media exposure. Furthermore, the court notes that Priscilla's use of IUDs significantly predates that of Mrs. Roth, and that Priscilla admits she learned of the possible connection between her IUD use and her health problems in 1983.

Given that this court in considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here the Waiteks, and give them the benefit of all reasonable inferences that can be drawn from the facts, *see Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. at 1356; *Munz,* 28 F.3d at 796; *Allison,* 28 F.3d at 66; *Johnson,* 994 F.2d at 545; *Burk,* 948 F.2d at 492; *Coday,* 939 F.2d at 667, the court concludes that the Waiteks have generated a genuine issue of material fact as to when Priscilla knew or should have known about her injuries and their possible connection to the Dalkon Shield IUD. This issue should be reserved for the ultimate fact finder, here a jury. Accordingly, the court denies that portion of the Trust's motion grounded on an assertion that the Waiteks' claims are time barred under Iowa law.

### B. Proximate Cause of Priscilla Waitek's Injuries

▇▇ Next, the court takes up the Trust's assertion that the Waiteks are unable to establish that Plaintiff Priscilla Waitek's use of the Dalkon Shield IUD caused the medical problems for which she and her husband have filed suit. Under Iowa law, products liability plaintiffs must prove that their injuries were caused by a product that was manufactured or supplied by the defendant. *Spaur v. Owens–Corning Fiberglas Corp.,* 510 N.W.2d 854 (Iowa 1994) (citing *Mulcahy v. Eli Lilly & Co.,* 386 N.W.2d 67, 76 (Iowa 1986)). A product is the legal cause of an

injury if it was a "substantial factor" in producing the injury, and if the injury would not have happened except for the conduct. *Spaur,* 510 N.W.2d at 858 (citing 1 Iowa Civil Jury Instructions 700.3 (1991)); *Johnson v. Interstate Power Co.,* 481 N.W.2d 310, 323 (Iowa 1992); *Iowa Elec. Light & Power Co. v. General Elec. Co.,* 352 N.W.2d 231, 234 (Iowa 1984).

The Iowa Court of Appeals made the following observations regarding causation under Iowa law:

Causation is a necessary element in all negligence cases. It is actually composed of two related but separate concepts. The first considers the actual cause of the harm. This is known as "cause-in-fact." The second part embraces the legal cause of the injury. This is known as "proximate cause." Even though an act of the defendant may be the factual or actual cause of the plaintiff's injury, liability will only be imposed if it is also a proximate or legal cause of the injury. The test to determine the actual cause prong of causation is known as sine qua non; but for the defendant's conduct, the harm would not have occurred. *State v. Marti,* 290 N.W.2d [570] at 585 [ (Iowa 1980) ]. The test to determine proximate or legal cause is more involved. Generally, an actor's conduct is a proximate or legal cause of harm to another if the conduct is a "substantial factor" in producing the harm and there is no other rule of law which relieves the actor of liability because of the manner in which the negligence resulted in the harm. *Kelly v. Sinclair Oil Corp.,* 476 N.W.2d [341] at 349 [ (Iowa 1991) ]. Iowa follows the Restatement (Second) of Torts in using the "substantial factor" test to help determine the existence of proximate or legal cause. *Id.; Frederick v. Goff,* 251 Iowa 290, 298, 100 N.W.2d 624, 629 (1960). This test is found in uniform instruction 700.3, together with the "but for" test.

---

her use of an IUD and a possible subsequent infection. Furthermore, unlike the plaintiff in *Roth,* who was told that her second IUD never should have been inserted and would have been informed by her physicians, had she asked, that

her PID was "IUD associated," *see Roth,* 27 F.3d at 1307, Priscilla was never warned not to have the second IUD inserted, and was never diagnosed with PID during the time she was wearing an IUD.

*Sumpter v. City of Moulton,* 519 N.W.2d 427, 434 (Iowa Ct.App.1994); *see also Jones v. City of Des Moines,* 355 N.W.2d 49 (Iowa 1984) (defining proximate cause as the substantial factor and but for cause).

■ Initially, the court must determine whether Dr. Dunker's affidavit generates a material issue of fact as to the element of causation. As required by Rule 56(e), the Waiteks have gone beyond the pleadings, and by affidavit designated "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. On the issue of causation, the Waiteks have offered the affidavit of Dr. Dunker. Dr. Dunker's affidavit states in relevant part that:

> After now considering all of the above relevant information regarding the sexual activity history of Marc and Priscilla Waitek and further considering their medical history and lack of any indication or diagnosis whatsoever of any sexual disease and after also considering Priscilla's past history, use of the Dalkon Shield and my personal knowledge of and experience with the Dalkon Shield and all of the prior medical records provided to me, it is my opinion based upon reasonable medical certainty that the Dalkon Shield was probably the major cause of Priscilla Waitek's medical problems, including her two miscarriages in 1979 and her ectopic pregnancies, her infertility problems and the various surgeries resulting in removal of her female organs.

Dr. Dunker Aff. at 4–5. Dr. Dunker's affidavit would appear to generate a genuine issue of material fact precluding the granting of summary judgment in favor of the Trust.

■ The Trust, however, contends that Dr. Dunker's affidavit should not be considered or allowed to create a genuine or sub-stantial factual issue sufficient to defeat that portion of its summary judgment motion grounded on the issue of causation. The Trust asserts that an affidavit that is in direct contradiction of prior deposition testimony does not raise an issue of material fact. *See Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361 (8th Cir.1983).

As the Trust's citation to this court's unpublished decision in *Postma v. First Federal Sav. & Loan Assoc. of Sioux City, IA,* No. 93–4058, at 16–21, 1995 WL 807082 (N.D.Iowa Mar. 27, 1995), demonstrates, this court is no stranger to either the Eighth Circuit's decision in *Camfield* nor its application.[16] In determining whether Dr. Dunker's affidavit may be considered and whether it creates a genuine issue of material fact, this court must consider application of the rule identified in *Camfield* and any exceptions to it. In *Camfield,* the Eighth Circuit Court of Appeals had to decide whether the conflict between a last minute affidavit and the affiant's earlier deposition testimony created a genuine issue as to any material fact, thus precluding the entry of summary judgment for defendant under Federal Rule of Civil Procedure 56. *Camfield,* 719 F.2d at 1364. The court noted a split in the circuits on this issue. *Id.* (comparing the conclusions in *Radobenko v. Automated Equip. Corp.,* 520 F.2d 540 (9th Cir.1975), which concluded that the conflict created by a later affidavit was not a genuine issue but a sham, and *Kennett–Murray Corp. v. Bone,* 622 F.2d 887, 893 (5th Cir.1980), which concluded that a genuine issue can be raised by a conflicting affidavit in certain circumstances). The court in *Camfield* found that other courts had considered various factors that might be adequate to fall within an exception to the rule that conflicting affidavits do not create a genuine issue of fact. *Id.*[17] Finding none of these

---

16. This court has also applied the *Camfield* decision in several of its prior published decisions. *See generally Kunzman v. Enron Corp.,* 902 F.Supp. 882, 896–98 (N.D.Iowa 1995) (holding that affidavits of two former co-workers would be considered and allowed to create a genuine or substantial factual issue, even though the plaintiff stated in his deposition that he was unaware of co-workers' knowledge, where the co-workers' affidavits specifically referred to a statement made in their presence and which the defendants

had not challenged in any other manner); *Rowson v. Kawasaki Heavy Indus., Inc.,* 866 F.Supp. 1221, 1229–31 (N.D.Iowa 1994) (holding that belated affidavit could be considered where affiant's memory was recently refreshed by photographs which he had not been shown during deposition).

17. Such factors included whether the inconsistency created by the affidavit existed within the deposition itself, or whether the affidavit ex-

circumstances present in the case before it, the court ruled that the affidavit did not create a genuine but only a sham issue of fact. *Id.* at 1365.

Subsequent appellate decisions in this circuit have sometimes read *Camfield* as stating the rule that courts will not allow an affidavit in conflict with earlier sworn testimony to create an issue of fact. *See, e.g., Adams v. Greenwood,* 10 F.3d 568, 572 (8th Cir.1993) ("an affidavit denying what is established by one's own evidence ... does not preclude summary judgment"); *Schlup v. Delo,* 11 F.3d 738, 742–43 (8th Cir.1993) (concluding that same rule should apply in the context of *habeas corpus* litigation), *vacated on other grounds,* — U.S. —, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). However, other decisions have observed exceptions to the rule. *See, e.g., RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 402 (8th Cir.1995) (noting that "[i]n *Camfield,* we held that contradictory affidavits will preclude summary judgment only if the prior testimony reflects confusion on the part of the witness and the affidavits explain why the earlier testimony is in conflict with the affidavits."); *Garnac Grain Co., Inc. v. Blackley,* 932 F.2d 1563, 1568 (8th Cir.1991) (in *Camfield,* "[w]e noted that the affidavit presented by the plaintiff's president failed to 'explain aspects of his deposition testimony, nor [did] the deposition reflect any confusion on Camfield's part that ... require[d] explanation,' " and extending the holding with these exceptions to an affidavit submitted by a nonparty); *Kim v. Ingersoll Rand Co.,* 921 F.2d 197, 199 (8th Cir.1990) (in *Camfield,* "we held in the context of summary judgment that unless a party explains the conflict in his own testimony, discrepancies in testimony do not create credibility issues for a jury when the district court perceives a readily apparent sham," and finding adequate explanation in the plaintiff's trial testimony of the discrepancy with prior testimony).

The court concludes that the rule in *Camfield* is most fairly stated to be that the Eighth Circuit Court of Appeals held [in

*Camfield* ] that an affidavit inherently contradicting the prior deposition testimony of the affiant and containing no explanation or clarification for the disparity fails to create a genuine issue of fact.

*Landmark Bank of St. Charles County v. Saettele,* 784 F.Supp. 1434, 1439 (E.D.Mo. 1992), *vacated on other grounds,* 21 F.3d 233 (8th Cir.1994). Decisions of the Seventh Circuit Court of Appeals, which has a rule similar to the one stated in *Camfield,* also stress the existence and plausibility of the affiant's explanation of the differences between his prior testimony and that found in the affidavit. *See, e.g., Unterreiner v. Volkswagen of Am., Inc.,* 8 F.3d 1206, 1210 (7th Cir.1993) (" 'A party may not create a *genuine* issue of fact by contradicting his own earlier statements, at least without a plausible explanation for the sudden change of heart,' " quoting *Richardson v. Bonds,* 860 F.2d 1427, 1433 (7th Cir.1988)); *Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1315 (7th Cir.1989) (affidavit in civil case must explain apparent inconsistency with deposition testimony in order to create an issue of fact on summary judgment); *Babrocky v. Jewel Food Co. and Retail Meatcutters Union, Local 320,* 773 F.2d 857, 861 (7th Cir.1985) (affidavits did not create factual issue precluding grant of summary judgment where they contradicted earlier deposition testimony without explaining the contradiction or attempting to resolve the disparity). The rule in *Camfield* does not preclude the court from considering the affiant's contradictory affidavit, even where no exception to the rule is found. *Dunavant v. Moore,* 907 F.2d 77, 79 n. 4 (8th Cir.1990) (so holding because even though the court in *Camfield* found no exception to the rule, the court considered the affidavit, and concluded only that it did not create a genuine issue of material fact). The court will therefore scrutinize Dr. Dunker's belated affidavit to see if it presents a plausible explanation for its discrepancies with prior testimony or other factors justifying an exception to the rule stated in *Cam-*

plained certain aspects of the prior deposition, citing *Kennett–Murray,* 622 F.2d at 894–95, lack of access to material facts or newly discovered evidence, citing *Office Supply Co. v. Basic/Four Corp.,* 538 F.Supp. 776, 785–86 (E.D.Wis.1982), and lack of inherent inconsistency with the prior deposition, confusion in the deposition, and plausibility of the assertions in the affidavit, citing *Letson v. Liberty Mut. Ins. Co.,* 523 F.Supp. 1221, 1230 (N.D.Ga.1981). *Id.*

*field* and whether the affidavit generates a material issue of fact precluding summary judgment.

Dr. Dunker's affidavit identifies the reason for the change in his testimony:

At the time I gave my deposition on Monday, January 30, 1995, I based my opinions on the information I had available to me at that time. However, I did not have the benefit of certain information which has an important impact on the opinions I gave at that time. That information includes the following:

(a) The deposition of Priscilla Waitek;

(b) The Affidavit of Priscilla Waitek;

(c) The deposition of Marc Waitek; and

(d) The medical records of Marc Waitek;

These Four items contain very relevant information along with all the other information provided me in the past will enable me to render an opinion in this case based upon a reasonable medical certainty as to the probable cause of Patricia Waitek's pregnancy and fertility problems after she used the Dalkon Shield from April 11, 1974 until I removed it with some moderate difficulty on November 28, 1977.

Dr. Dunker Aff. at 2–3.

Such an explanation of his change in testimony is at least plausible, and the court should not now pass on what credibility a jury may give it or the changed testimony.[18] If an affiant has only recently learned specific facts, then the affiant's new statements will often be inconsistent with prior statements however unequivocally made based on a different set of factual variables.

The court concludes that Dr. Dunker's affidavit falls within the exception stated in *Camfield* that an affidavit contradicting the prior deposition testimony of the affiant but containing an adequate explanation for the disparity may create a genuine issue of fact, and that Dr. Dunker's affidavit does create a genuine issue of material fact as to whether or not the Dalkon Shield caused Priscilla's injuries. In light of this genuine issue on the critical material facts on which the Trust has based its motion for summary judgment, the court concludes that the motion for summary judgment must be denied as to this ground.

### C. Compliance with Scheduling Order

■ Finally, the Trust contends that Dr. Dunker's affidavit should not be considered or allowed to create a genuine or substantial factual issue sufficient to defeat that portion of its summary judgment motion grounded on a lack of causation. The Trust asserts that an affidavit that contains expert opinions not timely disclosed under the court's scheduling order should not be allowed to raise an issue of material fact. On September 19, 1994, the court entered a scheduling order which required the Waiteks to designate their experts on or before April 15, 1995. The scheduling order further required the Waiteks to identify the expert's opinions as well as the basis for those opinions. On April 17, 1995, the Waiteks filed with the court their designation of expert witnesses.[19] The Waiteks identified Dr. Dunker as one of their two experts, the other being Dr. William A. Frumovitz.[20] The Waiteks' designation states in relevant part:

Dr. Dunker has given his deposition and will testify as to all matters discussed in the deposition. Dr. Dunker also will testify with respect to the product defect which was unreasonably dangerous and the cau-

---

**18.** The Trust correctly points out that Dr. Dunker does not explain, or even note, in his affidavit a change in his opinion, from the time of his deposition, concerning Priscilla's contracting of PID. In his deposition, Dr. Dunker stated that he could not say to a degree of medical certainty that Priscilla had PID at the time he removed her Dalkon Shield or Cu–7 IUDs. The Trust argues that such a finding of PID is a *sine qua non* to any finding of a causational nexus between Priscilla's use of the Dalkon Shield and her injuries. While this may well be the case, Dr. Dunker's affidavit clearly draws the causal nexus between the Priscilla's wearing of the Dalkon Shield and her injuries. Thus, Dr. Dunker's affidavit raises implicitly the issue of the Dalkon Shield's causing PID in Priscilla. Although one might well reject Dr. Dunker's explanation for his change in positions, that is the province of the jury.

**19.** The Waiteks' designation of expert witnesses is the Trust's Exhibit I.

**20.** The Waiteks do not contend that Dr. Frumovitz will provide testimony as to causation.

sation of the product defect with injuries sustained by Priscilla Waitek.

Dr. Dunker will testify that in April 1974 the patient had a Dalkon Shield IUD inserted and this was changed in January 1977 to a Copper # 7. Since that time the patient had a number of medical and surgical complications that can likely be attributed to the use of an IUD, and the Dalkon Shield in particular.

Dr. Dunker's opinions are based upon his knowledge of the historical events surrounding Ms. Priscilla Waitek's medical problems and his own background, training, education, and experience.

Plaintiffs' Designation of Expert Witnesses at 2.

Pursuant to Federal Rule of Civil Procedure 16(b), the court has the authority to enter scheduling orders. One court has remarked that

[s]uch orders and their enforcement are regarded as the essential mechanism for cases becoming trial-ready in an efficient, just, and certain manner. The control of these schedules is deliberately reposed in the court, and not in counsel, so that this end may be achieved. *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 790 (1st Cir.1988), *cert. denied*, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989); *Compagnie Nationale Air France v. Port of New York Authority*, 427 F.2d 951 (2nd Cir.1970); *Forstmann v. Culp*, 114 F.R.D. 83, 85 (M.D.N.C.1987); *Gestetner Corp. v. Case Equipment Co.*, 108 F.R.D. 138, 141 (D.Me.1985).

*Kramer v. The Boeing Co.*, 126 F.R.D. 690, 696 (D.Minn.1989). A scheduling order is an important tool in controlling litigation. *Jochims v. Isuzu Motors, Ltd.*, 145 F.R.D. 507, 510 (S.D.Iowa 1992). A magistrate judge's scheduling order "is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by [parties] without peril." *Gestetner Corp. v. Case Equip. Co.*, 108 F.R.D. 138, 141 (D.Me.1985). Scheduling orders have become increasingly critical to the district court's case management responsibilities because "[i]t is well known that we litigate these days under the burden of heavy caseloads and clogged court calendars." *Id.*

The court in *Geiserman v. MacDonald*, 893 F.2d 787 (5th Cir.1990), also observed that the flouting of court ordered deadlines causes substantial harm to the judicial system. The court stated:

[d]elays [in litigation] are a particularly abhorrent feature of today's trial practice. They increase the cost of litigation, to the detriment of the parties enmeshed in it; they are one factor causing disrespect for lawyers and the judicial process; and they fuel the increasing resort to means of non-judicial dispute resolution. Adherence to reasonable deadlines is critical to restoring integrity in court proceedings.

*Id.* at 792. Adherence to reasonable deadlines is therefore critical to maintaining integrity in court proceedings.

Federal Rule of Civil Procedure 16(f) identifies the sanctions available to the court for the failure of a party to obey a scheduling or pretrial order as those stated in Federal Rule of Civil Procedure 37(b)(2)(B), (C), or (D). The sanctions available therefore include prohibiting prosecution of certain claims or defenses or introducing certain evidence, *Fed.R.Civ.P.* 37(b)(2)(B), dismissal of the action or entry of default judgment, *Fed. R.Civ.P.* 37(b)(2)(C), or treating the noncompliance as contempt. *Fed.R.Civ.P.* 37(b)(2)(D). Federal Rule of Civil Procedure 41(b) also provides for dismissal for failure of the plaintiff to prosecute or to comply with the rules of civil procedure or any order of the court, and states that such a dismissal is an adjudication on the merits. *Fed.R.Civ.P.* 41(b); *see also Am. Inmate Paralegal Assoc. v. Cline*, 859 F.2d 59, 61 (8th Cir.1988) (court may dismiss under Rule 41(b) for failure to comply with court order, and such a dismissal operates as an adjudication on the merits).

The granting of the sanction requested by the Trust in this matter would be the functional equivalent of dismissal since it would deprive the Waiteks of any expert testimony as to causation, a necessary element in their action. Although a district court has authority, in its discretion, to dismiss an action with prejudice for failure to comply with court orders or the Federal Rules of Civil Procedure, *see Aziz v. Wright*,

34 F.3d 587, 589 (8th Cir.1994) ("An action may be dismissed pursuant to Rule 41(b) if a plaintiff has failed to comply with any order of the court."); *Omaha Indian Tribe v. Tract I—Blackbird Bend Area,* 933 F.2d 1462, 1468 (8th Cir.1991) (citing rules 16, 37, and 41 as granting authority to dismiss for failure to comply with court orders); *see also Fletcher v. Southern Farm Bureau Life Ins. Co.,* 757 F.2d 953, 956 (8th Cir.1985) (dismissal as sanction is reviewed for abuse of discretion), courts have concluded that dismissal with prejudice should be used sparingly because it is a drastic sanction. *Woods v. Union Pacific R.R. Co.,* 957 F.2d 548, 550 (8th Cir.1992); *Omaha Indian Tribe,* 933 F.2d at 1468; *Mullen v. Galati,* 843 F.2d 293, 294 (8th Cir.1988) (dismissal under Rule 41(b) is a "severe sanction"). The Eighth Circuit Court of Appeals therefore applies a balancing test, " 'balancing the policy of giving the plaintiff her day in court against [the] polices of preventing undue delay, avoiding court congestion, and preserving respect for court procedures.' " *Omaha Indian Tribe,* 933 F.2d at 1468 (quoting *Garrison v. International Paper Co.,* 714 F.2d 757, 760 (8th Cir.1971)). The balancing process " 'focuses in the main upon the degree of egregious conduct which prompted the order of dismissal and to a lesser extent upon the adverse impact of such conduct upon both the defendant and the administration of justice in the District Court.' " *Id.* (quoting *Brown v. Frey,* 806 F.2d 801, 804 (8th Cir.1986), in turn quoting *Moore v. St. Louis Music Supply Co., Inc.,* 539 F.2d 1191, 1193 (8th Cir. 1976)); *cf. American Inmate Paralegal Assoc.,* 859 F.2d at 61 (applying "clear record of delay and contumacious conduct" standard cited above for dismissal for failure to make discovery to dismissal under Rule 41(b)). The court should consider whether the party whose action was dismissed willfully refused to comply with court orders. *Id.* "Willful as used in the context of a failure to comply with a court order . . . implies a conscious or intentional failure to act, as distinguished from accidental or involuntary noncompliance." *Id.* (quoting *Welsh v. Automatic Poultry Feeder Co.,* 439 F.2d 95, 97 (8th Cir.1971)); *see also Aziz,* 34 F.3d at 589 (finding dismissal proper under Rule 41(b) for willful disregard of court order and court's warning of consequences for failure to comply); *Fletcher,* 757 F.2d at 956 (dismissal under Rule 41(b) is warranted in cases of " 'willful disobedience of a court order or continued or persistent failure to prosecute a complaint,' " quoting *Givens v. A.H. Robins Co., Inc.,* 751 F.2d 261, 263 (8th Cir.1984)); *Mullen,* 843 F.2d at 294 (also quoting *Givens* ).

In the present case, the court concludes that any failure on the part of the Waiteks to comply with the court's scheduling order is not willful. First, the court notes that the Waiteks identified Dr. Dunker in their disclosure. Furthermore, the Waiteks indicated that Dr. Dunker would testify regarding causation. Finally, it appears from the record that any change in Dr. Dunker's proposed testimony regarding causation has been of recent origin and based upon new information available to Dr. Dunker. Under these circumstances, the court concludes that to grant the sanction requested by the Trust, which would be the equivalent of dismissal for failure to comply with a court order pursuant to Federal Rule of Civil Procedure 16, would be unduly harsh and at odds with the mandate of Federal Rule of Civil Procedure 1 which requires that the rules of civil procedure "be construed and administered to secure the just . . . determination of every action."

## V. CONCLUSION

First, the court concludes that the Waiteks have generated a genuine issue of material fact as to when Priscilla knew or should have known about her injuries and their possible connection to the Dalkon Shield IUD. Thus, the court denies that portion of the Trust's Motion for Summary Judgment based on a claim that the Waiteks' claims are time barred under Iowa law. This issue is reserved for the ultimate fact finder. Additionally, the court concludes that summary judgment is inappropriate on the issue of causation. Dr. Dunker's affidavit, generates a genuine issue of material fact as to whether or not the Dalkon Shield caused Patricia Waitek's injuries. Although, as a general rule, such a belated affidavit cannot be al-

lowed to generate a fact question, the court finds that the affidavit in question here plausibly explains its discrepancies with prior testimony as the result of Dr. Dunker's review of new information subsequent to his deposition. Finally, under the circumstances of this case, the court concludes that to grant the sanction requested by the Trust and not consider Dr. Dunker's affidavit, which would be the equivalent of dismissal for failure to comply with a court order pursuant to Federal Rule of Civil Procedure 16, would be unduly harsh given that any failure to comply with the scheduling order was not willful. Therefore, the court denies the Trust's Motion for Summary Judgment in its entirety.

**IT IS SO ORDERED.**